MOORE, J.
The defendant, Brittney McGill, was indicted for the second degree murder of her friend, Gabrielle "Gabby" Cooper, during a physical altercation that erupted from a dispute over a car. After trial, the *349 jury returned a verdict of manslaughter, a violation of La. R.S. 14:31, thereby rejecting McGill's claim of justifiable homicide. The court sentenced McGill to 22 years' imprisonment at hard labor. This appeal followed.
For the following reasons, the defendant's conviction and sentence are affirmed.
FACTS
Brittney McGill and Gabby Cooper were friends who purchased a yellow Chevrolet Cobalt together. Gabby provided the money to purchase the car, but because she had no driver's license as required to register the vehicle, Brittney agreed to register it in her own name. Things soon fell apart. According to trial testimony from witnesses who knew the circumstances, when the car's temporary paper tags were near expiration, Gabby advertised on Facebook seeking someone who could provide underground tags. Brittney also heard that Gabby was letting other people use the car. On April 11, 2015, accompanied by police, Brittney retrieved the Cobalt and parked it at her residence. This was two days before the incident leading to Gabby's death.[1]
On April 13, 2015, La'Tia "Tia" Haynes drove Gabby and Sha'Crystal "Crystal" Burrough to a house on the corner of 69th Street and Clift Street, where the Cobalt was parked in the driveway. The house is owned by the parents of Haston "Head" Smith Jr., who was Brittney's boyfriend at that time. Brittney was in the house when the young women arrived.
The house faces 69th Street at the corner of Clift Street. La'Tia parked her car around the corner on Cliff St. beside the front yard. As the trio entered the fenced yard, Head Smith arrived in his green Mustang and backed into the driveway in front of the yellow Cobalt. He was accompanied by two male friends, Sha'Cortez Monroe and Jacobe Harris. Crystal testified that they asked Head about getting the Cobalt. Brittney immediately stepped outside and said, "She ain't getting nothing!" Tia Haynes confirmed that Brittney refused to give the Cobalt to Cooper.
Crystal and Tia both testified that Gabby and Brittney "just started fighting" right then and there in the driveway. Crystal did not see or know who threw the first punch. She testified that the fight went on for some time, consisting of three or four "rounds." She said they kept stopping or that she and Head would break the combatants up, but their arguing led them to start fighting again. Crystal said that there were no weapons used while the fight was contained in the driveway. At some point in the fight or perhaps during a break in the action, Gabby ripped the paper tags off the Cobalt.[2]
At least two onlookers video-recorded parts of the fight on their cell phones. Crystal and Tia made four such video clips on Crystal's cell phone, and police copied these onto a DVD introduced into evidence as Ex. 30 and played to the jury. Of limited quality and duration, their main usefulness was to enable the jury to understand and compare testimony regarding the scene of the fight and to identify the participants *350 and onlookers in the fight by their clothing. Importantly, the jurors were able to assess the actions of the two women leading up to the actual stabbing.
Tia testified that after the third round, she, Tia and Gabby began walking out of the driveway to Tia's car. She said the stabbing occurred in the street behind Tia's parked vehicle on Clift St. A higher quality cell phone video of this fatal stage of the fight was recorded from the front porch of the house directly across the street (introduced as Ex. 31). The recording shows Tia (wearing shorts) standing on the sidewalk corner just outside the front yard of the house while Gabby (wearing pink pants) and Crystal (wearing a pink sweater) are standing near the edge of the property on the right side of the driveway. At the same time, Brittney (wearing white pants and black blouse) is seen walking out from the carport on the right side of the two cars parked in the driveway with her hands on her hair. As she walked around the corner of the Mustang toward the three women, Gabby backed onto the sidewalk while Tia and Crystal stepped toward Brittney. Gabby then turned and began walking away from the corner onto the street, heading toward the middle of the intersection. Brittney, who initially walked across the yard toward Tia's car, evaded Tia and Crystal and began walking toward Gabby. When Gabby looked back and saw Brittney approaching her, she stopped and faced Brittney while backing up toward Tia's car. Brittney lunged toward Gabby, thrusting several times with her right arm as Gabby was backing onto the corner sidewalk screaming. Tia testified at trial that Gabby screamed that she had been stabbed, but also she (Tia) did not realize this until she collapsed by her car. The video confirms Tia's testimony that Gabby screamed several times and then collapsed behind her car. As several onlookers rushed toward Gabby behind Tia's car, Brittney can be seen walking out from the carport on the right side of the two cars, looking toward Tia's car, then turning and walking back toward the carport. At this moment the video ended.
Crystal and Tia testified that they waited until an ambulance came and picked up Gabby to take her to the hospital. They intended to go to the hospital but were stopped by police and brought in for questioning about the incident.
There were other witnesses at trial whose testimony corroborated the video evidence. Laretha Moore testified that she was in her home directly across the street on West 69th St. when she heard noise outside. Moore went outside and saw two women fighting at the house across the street. She identified Gabby Cooper, a former coworker, as one of the women, and said that she attempted to talk to them and convince them to stop fighting. When it seemed as though the fighting was over, Moore went back into her house, but soon heard another commotion. When she went outside again, it looked as though Gabby was leaving. Moore walked to the end of her driveway and observed the two women fighting again. She did not actually see the stabbing, but heard Gabby say that she had been stabbed.
Moore also confirmed that Ex. 31, the stabbing video clip, was recorded from her front porch by a friend of her brother.
Henry Jones, another neighbor who witnessed the fight, testified that he heard a commotion outside. He opened his front door and observed two women fighting in the front yard of the house cater-corner to his across the intersection. Jones testified that the fighting stopped and Gabby[3] *351 grabbed the tags off one of the cars and started toward the car parked on Clift St. (Tia's vehicle); Brittney then followed Gabby out of the yard. He saw Brittney rush at Gabby and make a thrusting motion, and then Cooper fell to the ground. Jones stated that, when he "saw it getting really crazy," he called 911.
EMS transported Gabby to University Health, where physicians were unable to stop the bleeding from her heart, and she died. After EMS arrived, Crystal and Tia left the scene in Tia's vehicle, but were stopped by police and taken in for statements. Head Smith, Sha'Cortez Monroe and Jacobe Harris were also taken to the detectives' office to give statements. Thereafter, Smith could not be located, and he did not testify at trial. A bench warrant was issued for him as a material witness.
Each of the witnesses confirmed that Gabby Cooper was stabbed by Brittney McGill. One of the men, Sha'Cortez Monroe, reported to Shreveport Police Corporal David Bonillas that he picked up the knife used to stab Gabby and placed it inside the house on the kitchen counter. Police retrieved that knife and other kitchen knives from the counter during their initial investigation. The murder weapon was identified and introduced into evidence at trial.
Officer Jeffrey Hammer responded to the scene and took Brittney into custody. Brittney gave a voluntary, recorded statement to Cpl. Bonillas, saying that she stabbed Gabby because Gabby would not stop fighting and no one would intervene to stop it. Brittney also stated that she retrieved a knife to protect herself because there were three other women. When asked at trial, Cpl. Bonillas testified that Brittney's statements did not match the video of the stabbing.
Corporal Bonillas also testified that he listened to recordings of phone calls that Brittney made from Caddo Correctional Center. All inmate phone calls are recorded, and these were admitted as Ex. 112. In one of the calls, Brittney asked the other party to talk to Crystal Burrough about Crystal's trial testimony and for her to say that Brittney "didn't go back in the house."
Dr. James Traylor performed an autopsy on Gabby Cooper and testified at trial. He determined that the cause of death was sharp force injury in the form of a penetrating stab wound to the left chest that pierced Gabby's heart. He noted that the physicians had opened her chest and sutured the wound on the front of her heart, but could not stop the bleeding from the back of her heart. Gabby's manner of death was classified as a homicide.
Dr. Omar Haque testified that Brittney McGill came to the ER at University Health on April 13, 2015 (the day of the fight), with complaints of abdominal cramping and vaginal bleeding. Although she informed him about the fight with Gabby, Brittney could not recall whether she had been struck in the abdomen. Brittney reported that she was seven weeks pregnant; however, an abdominal ultrasound was performed and no intrauterine pregnancy was visualized. At the time of examination, her vagina and cervix were normal and there was no discharge, there was no bruising her abdomen and no blood found on examination. A transvaginal ultrasound was performed and no gestational sac (the sac in which the fetus develops) was visualized in the uterus. Dr. Haque said that could mean many things, "if it's not in the uterus or if it's not *352 visualized, it could mean that that it's not there anymore or it never was there." Brittney's primary diagnosis was an ectopic pregnancy[4] and a repeat blood pregnancy test was recommended in two days.
After trial, the jury returned a verdict of manslaughter. The court ordered a presentence investigation. The court denied a defense motion for new trial and a motion for post-verdict judgment of acquittal.
On June 18, 2018, Brittney McGill was sentenced to 22 years' imprisonment at hard labor. A motion to reconsider sentence was denied by the trial court. This appeal followed.
DISCUSSION
By her first assignment of error, Brittney contends that the state failed to prove that she was not justified in acting in self-defense or defense of another when she stabbed Gabby Cooper. She argues that the evidence showed that she acted in self-defense and in the defense of her unborn child when she stabbed Gabby. She maintains that she was pregnant at the time of the fight and subsequently lost the child. She argues that she had reason to fear Gabby because Gabby had repeatedly threatened her and refused to leave the scene of the fight when her friends asked her to do so.
The state counters that the evidence adduced at trial proved beyond a reasonable doubt that the fight had ended and that Gabby was withdrawing when Brittney fatally stabbed her. Furthermore, despite Brittney's claim that she was acting in defense of her unborn child, there was no evidence to show any causal connection between the loss of Brittney's child and the stabbing of Gabby. The evidence showed, it maintains, that self-defense and defense of others were not credible defenses in this case.
Justifiable homicide is defined by La. R.S. 14:20, the pertinent parts of which read:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
* * *
C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.
*353 When a defendant claims justifiable homicide by an act in self-defense, the state has the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. State v. Lensey , 50,242 (La. App. 2 Cir. 11/18/15), 182 So.3d 1059, writ denied , 15-2344 (La. 3/14/16), 189 So.3d 1066 ; State v. Johnson , 41,428 (La. App. 2 Cir. 9/27/06), 940 So.2d 711, writ denied , 06-2615 (La. 5/18/07), 957 So.2d 150. Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Johnson, supra.
When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of others. State v. Lensey , supra ; State v. Davis , 46,267 (La. App. 2 Cir. 5/18/11), 69 So.3d 538, writ denied , 11-1561 (La. 1/13/12), 77 So.3d 952.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 16-1479 (La. 5/19/17), 221 So.3d 78 ; State v. Gullette , 43,032 (La. App. 2 Cir. 2/13/08), 975 So.2d 753. A reviewing court may not impinge on the factfinder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442.
In this case, the jury found that Brittney was guilty of manslaughter. Brittney does not deny that she stabbed Gabby, inflicting the fatal wound during the fight. Hence, there was sufficient evidence to support her conviction for manslaughter unless the state failed to prove, beyond a reasonable doubt, that the homicide was not committed in self-defense, as Brittney alleges.
The defense argued that Brittney stabbed Gabby because she feared for her life and for the life of her unborn child. However, the evidence shows that both Gabby and Brittney were angry about the car and chose to settle the dispute by fighting. The testimony as well as videos also showed that both women had previously engaged in numerous fistfights prior to this incident. This altercation began as a fistfight and, according to testimony and videos, appeared to be over when Brittney pursued Gabby, who was walking away from the house, confronted her again and stabbed her with a knife. There was no evidence that Brittney reasonably believed that she was in imminent danger of losing her life or the life of her unborn child, or that she reasonably believed that killing Gabby was necessary to save her own life or the life of her unborn child.
While witnesses testified that both women had a history of fighting, neither had a history of using weapons during fights. The evidence showed that Gabby did not *354 have a weapon. The video taken by Crystal Burrough showed that Brittney was a willing participant in the fight, and, in fact, appeared to be getting the better of Gabby.
The "stabbing video clip" recorded from the home of Laretha Moore showed that Gabby had exited the yard and was moving away from the house when Brittney pursued her with the knife. Moore testified that it appeared that Gabby was leaving when Brittney followed her from the yard.
Henry Jones, the other neighbor who witnessed the fight, also testified that Brittney followed Gabby from the yard just prior to the stabbing. Crystal Burrough and Tia Haynes testified that they were preparing to leave when Brittney followed and re-engaged her. Haynes testified that she saw no reason for Brittney to follow Gabby from her yard with a knife. Although there is no unqualified duty to retreat, the evidence established that Brittney could have retreated to Smith's house, rather than continue and escalate the fight.
In view of the trial record of evidence, the jury obviously rejected the defendant's claim of self-defense or defense of an unborn child and concluded that the state met its burden. We find no error in the conclusion. This assignment of error is without merit.
By her second assignment of error, Brittney argues that the trial court erred in failing to give the requested jury instructions regarding justification, specifically defense of others. Specifically, she contends that, under the circumstances of this case, the trial court should have instructed the jury regarding the "defense of others" justification. She asserts that because Gabby could have been charged with second degree feticide had her actions resulted in the loss of the unborn child, she (Brittney) could have been acting in defense of her unborn child to protect its life. She argues that, because the state did not prove beyond a reasonable doubt that she was not acting in self-defense or the defense of another, the jury should have received specific instructions on self-defense and the defense of others justification.
The state responds that a specific jury instruction regarding the defense of others justification was not required because the requested special jury charges were sufficiently set forth by the general charges. The state further argues that the special charges would have been confusing and required explanation due to Brittney's willing participation in the fight and known propensity to engage in fights. The state asserts that Brittney presented no evidence that the fight contributed to the loss of her unborn child and that any argument concerning feticide is without merit.
A trial judge has the duty to instruct jurors as to "every phase of the case supported by the evidence whether or not accepted by him as true," and that duty extends to "any theory ... which a jury could reasonably infer from the evidence." La. C. Cr. P. art. 802 ; State v. Goodley , 01-0077 (La. 6/21/02), 820 So.2d 478 ; State v. Tucker , 49,950 (La. App. 2 Cir. 7/8/15), 170 So.3d 394, writ not cons. , 15-1517 (La. 3/9/18), 237 So.3d 1193. Both the state and the defendant have the right, before argument, to submit special written charges for the jury to the court. A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La. C. Cr. P. art. 807.
*355 Errors in jury instructions are subject to the harmless error analysis. Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Spears , 39,302 (La. App. 2 Cir. 9/27/06), 940 So.2d 135, writ denied , 06-2704 (La. 8/31/07), 962 So.2d 424. A jury charge must be considered as a whole, and particular phrases in a charge must be construed in the context of the entire charge. A conviction will not be reversed on the ground of an erroneous charge unless the disputed portion, viewed with the remainder of the charge, is erroneous and prejudicial. State v. Mitchell , 50,188 (La. App. 2 Cir. 11/18/15), 181 So.3d 800, writ denied , 15-2356 (La. 1/9/17), 214 So.3d 863.
The defense requested that the jury instructions contain four special charges, submitted to the court and marked as Instructions I-IV. These consisted of the statutory definition of justifiable homicide and the "stand your ground" doctrine found in R.S. 14:20, the definition of the "defense of others" justification found in R.S. 14:22, and instructions regarding the application of those definitions.
Our review of the jury charges given in this case indicates that the jury was instructed on the definition of justifiable homicide and the "stand your ground" doctrine, in language mirroring that of R.S. 14:20. In requested Instruction I, the defense requested that the jury be instructed on the four factors to be considered in determining whether the defendant had a reasonable belief that the killing was necessary to save herself from the imminent danger of losing her life or receiving great bodily harm. The instructions ultimately given contained the following: the definition of justifiable homicide in self-defense and to prevent a violent or forcible felony; the explanation that "the danger need not have been real as long as the defendant reasonably believed that she was in actual danger"; the state's burden of proof; and, the "stand your ground" doctrine, as requested by the defense in requested Instructions I-III.
The main difference between the instructions requested and those given is that the latter did not include the four factors to be considered in determining the reasonableness of the defendant's belief that the killing was necessary. Despite that omission, the requested instructions were substantially covered by the general charge and the defendant has not shown any prejudice as a result of the failure of the trial court to include the four factors in the jury charge.
In requested Instruction IV, the defense requested that the jury be instructed on the "defense of others" justification, specifically the statutory definition of defense of others and the application of that statute. Although the text of R.S. 14:22 is not contained in the jury instructions given, the court instructed the jury on the prevention of violent or forcible felony justification defense.
A requested charge shall be given only if it does not require qualification or explanation. Upon review of the record evidence, we conclude that the trial court did not err by refusing to include this requested charge. There was no evidence that Brittney tried to avoid the fight in order to protect her alleged pregnancy. There was no medical evidence that the fight caused her to have a miscarriage. Dr. Haque testified that although Brittney complained of cramps and vaginal bleeding, he found no bleeding at that time;
*356 further, bleeding can be caused by a number of things, and pregnancy is often accompanied by cramps. He testified the Brittney did not recall any trauma to her abdomen during the fight. While he did not find evidence of a fetus in her uterus after two ultrasound tests, he did not rule out a provisional diagnosis of ectopic pregnancy. In any event, the important fact is whether Brittney reasonably believed that she was acting in defense of her unborn child and we find no evidence in this record of such purpose either preceding or during the fight leading to the stabbing. In fact, prior to the stabbing, according to testimony and video, the fight consisted mostly of trading insults, hair pulling and punches to the face.
In view of these considerations and the evidence presented regarding Brittney's pregnancy, a jury instruction regarding the "defense of others" for a justifiable homicide defense would have required considerable qualification or explanation beyond the requested charge. Accordingly, we hold that the trial court did not err in its refusal to include the requested special charge in its instructions to the jury. This assignment of error is without merit.
By her final assignment of error, the defense alleges that the sentence imposed was unconstitutionally harsh and excessive given the facts and circumstances of the case. Brittney argues that the sentence imposed, 22 years' imprisonment, was unconstitutionally harsh and excessive. She argues that the trial court failed to properly consider the lack of violent crimes in her criminal history and her expressions of remorse. She contends that the sentence does not further the ends of justice, and is nothing more than a needless and purposeless imposition of suffering.
The state replies that 22 years' imprisonment does not shock the sense of justice in this case. The state notes that Brittney re-engaged in the fight after Gabby attempted to leave, and fatally stabbed Gabby. The state argues that the trial court properly considered all relevant evidence, including the age of the defendant and the victim, the effect of Gabby's death on her family, Brittney's prior criminal record, and the gravity and seriousness of the offense.
A reviewing court applies a two-pronged test in determining whether a sentence is excessive. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. State v. Smith , 433 So.2d 688 (La. 1983) ; State v. Watson , 46,572 (La. App. 2 Cir. 9/21/11), 73 So.3d 471. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. State v. Lanclos , 419 So.2d 475 (La. 1982).
Second, the reviewing court must determine the issue of constitutional excessiveness. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith , 01-2574 (La. 1/14/03), 839 So.2d 1. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver , 01-0467 (La. 1/15/02), 805 So.2d 166. The trial court is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of this discretion.
*357 State v. Williams , 03-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Diaz , 46,750 (La. App. 2 Cir. 12/14/11), 81 So.3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. State v. Williams, supra .
Manslaughter carries a maximum sentence of imprisonment at hard labor for not more than 40 years. La. R.S. 14:31(B). Brittney was indicted for second degree murder, which requires a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1.
Following review of the presentence investigation report and a sentencing hearing, during which the victim's mother testified, the trial court sentenced Brittney to 22 years' imprisonment at hard labor. Because she was charged with second degree murder, she had been exposed to a potential life sentence. Her conviction for the lesser offense of manslaughter carries a maximum of 40 years' imprisonment, so 22 years is a midrange sentence and she received a significant benefit from the jury's verdict.
Brittney's assertions to the contrary, the trial court did specifically consider the lack of violent crimes in her criminal history and her expressions of remorse. The trial court referenced her criminal history of "primarily misdemeanors," as evidenced by the presentence investigation report. The trial court also noted that Brittney was remorseful regarding the death of Gabby.
The trial court also considered the nature of the offense and the effect of Gabby's death on her family. At the sentencing hearing, Joyce Cooper, Gabby's mother, testified that her daughter was 21 years old when she died and had three children. The responsibility for raising two of those children has fallen to Ms. Cooper. Ms. Cooper testified that the children were in counseling because "they cry all the time in school."
Based on the facts of this case, the remorse shown by the defendant, the severity of the injuries sustained by the victim, and in light of the harm done to Gabby's family, the sentence imposed does not shock the sense of justice, nor is it grossly disproportionate to the offense for which McGill was convicted. The trial court was within its discretion in imposing the sentence, which is not excessive. This assignment of error is without merit.
We have reviewed the entire record and find nothing we consider to be manifest error. La. C. Cr. P. art. 920(2).
CONCLUSION
For the reasons stated above, we affirm Brittney McGill's conviction of manslaughter for the death of Gabrielle Cooper, and we affirm the sentence of 22 years at hard labor imposed by the trial court.
CONVICTION AND SENTENCE AFFIRMED.

Joneica Lewis testified that she was with Brittney at the time, and Brittney intended to retrieve only the temporary tags from the vehicle; however, she said the police told her to take the vehicle that was illegally parked in a handicapped zone because Gabby had no license to drive it and removing the temporary tags would further render driving the vehicle unlawful.

Due to some contradictory testimony, it is uncertain whether Gabby also ripped the tags off the green Mustang in addition to those on the yellow Cobalt.

Not knowing them by name, Jones referred to Gabby as "the short one" and Brittney as "the tall one."

An ectopic pregnancy occurs when an embryo implants somewhere other than the uterus, such as one of the fallopian tubes.